## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **IN RE:** | |
| **CASEY JOE EVANS,** | **Case No. 20-40430-JMM** |
| **Debtor.** | |

| | |
|---|---|
| **D.L. EVANS BANK,** | |
| **Plaintiff,** | |
| **v.** | **Adv. No. 20-08054-JMM** |
| **CASEY JOE EVANS,** | |
| **Defendant.** | |

## MEMORANDUM OF DECISION

### INTRODUCTION

Before the Court is an adversary proceeding in which D.L. Evans Bank ("Plaintiff") seeks a judgment excepting from discharge its claim against Casey Joe Evans ("Defendant") under § 523(a)(2)(B).[1]  This matter was tried on July 21, 2021 with the parties submitting written closing arguments, after which the matter was taken under advisement.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334, and all issues

---

[1] Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101–1532.

MEMORANDUM OF DECISION - 1

before it are core matters on which it may enter final decisions under 28 U.S.C. § 157.
Moreover, the parties expressly consented to this Court entering a final judgment in this
case.  Dkt. No. 13 at ¶ 4.

After considering the evidence and testimony presented, the parties' arguments, as
well as the applicable authorities, this Court enters the following findings of fact and
conclusions of law.  Fed. R. Bankr. P. 7052.

## FINDINGS OF FACT

In 2018, the Defendant was approached by Braden and Rodney Lake ("the
Lakes") about an opportunity to purchase their parts shop, Magic Valley Bearing Ag
Supply, LLC ("Magic Valley").  At the time, Defendant had conducted business with the
Lakes for a few months while working for his family's farm and performing repair
services. Ex. 114 at 7–8.  Initially, the Lakes were asking $400,000 for Magic Valley. *Id.*
at 9.

In approximately October 2018, Defendant approached Ray Parrish, an employee
of Plaintiff's Blue Lakes branch, to seek financing for the purchase of Magic Valley. Ex.
114 at 11.  At the time, Mr. Parrish did not approve financing for Defendant, even after
the purchase price was lowered to $200,000. *Id.* at 11–13.  When the Defendant informed
Braden Lake that he was unable to continue with the proposed purchase, the Lakes
directed him to Mr. Brooks Corbridge, their banker at Plaintiff's Burley branch. *Id.* at 13.
After further negotiations, the purchase price was lowered to $175,000.

As part of the loan application process, Defendant provided his 2017 tax returns,
which included a tax depreciation form.  This form listed several assets, including a JLG

Man Lift, John Deere 4640 Tractor, Cincinatie [sic] Mill, Labond Lathe 8' Bed, 1988

Clark Hyster X140I, and John Deere 310 C Backhoe, along with their depreciated values.

Ex. 101.  It was later discovered that Defendant either never had, or no longer owned,

these above-listed assets, and that most belonged to his father. Ex.110 at 39–41.

On the morning of January 7, 2019, Plaintiff's Burley branch manager, Jerri

Tegan, sent Defendant a secured message with an attachment containing the financial

statement she had prepared in connection with the loan. Ex. 102.  Ms. Tegan also

prepared a separate equipment schedule—a document that listed the make, model, year,

and value of each item of equipment that was listed on Defendant's 2017 tax depreciation

form. *Id.* at 5.  The financial statement was part of a Microsoft Excel workbook, which

included a separate tab containing the equipment schedule. Ex. 102 at 5.  This message

could only be opened by following a link and creating a password.  On January 7 at 9:57

a.m., Ms. Tegan received a confirmation generated by Plaintiff's encryption software that

the secured message had been opened. Ex. 102 at 2.

Around that time, Defendant was also communicating via text message with Mr.

Corbridge. Ex. 103.  In these text messages, Mr. Corbridge asked:

> "Are any of the trucks we were talking about taking as collateral ones that
> you plan on selling?"

Defendant responded:

> "Negative! Or do you want some of them out of my equipment business as well?"

Mr. Corbridge responded:

MEMORANDUM OF DECISION - 3

"Not necessarily. I think there might have been a misconception that you would be selling what were [sic] planning on taking as collateral. Would it be possible to get a few pictures of the trucks?"

Ex. 103 at 2.  In response, Defendant sent four pictures depicting a John Deere 4640 Tractor, a 2001 International 930I, a 2008 35' C&B equipment trailer, a Kenworth W900, and a 1995 Dodge drag truck. *Id.* at 3–5.  Additionally, in a series of text messages from January 15, 2019, Defendant sent photos of the JLG Man lift and Clark Hyster upon Mr. Corbridge's request. Ex. 103 at 8–9.

Two separate loans were ultimately approved.  The loans were in Magic Valley's name, and Defendant was named as a guarantor on both. Ex. 108.  The first was a $25,000 loan for working capital, with "all inventory and accounts" pledged as collateral. *Id.*  Magic Valley obtained a second loan in the amount of $101,212 to fund the purchase of the business, with ten vehicles and "all equipment and farm equipment" listed as collateral. *Id.*

On January 18, 2019, Defendant went to Plaintiff's Blue Lakes branch to close on the two loans. Ex. 114 at 40.  Defendant testified that he felt rushed and did not get a chance to review all the loan documents, as Plaintiff was about to close for the day. Ex. 114 at 41.  Witley Ball, an employee of Plaintiff who was present at closing, testified at trial, however, that an officer reviewed all the documents with Defendant and reassured him that they would stay open as long as necessary to complete the paperwork.  At the closing, Defendant signed the financial statement. Ex. 100.  The financial statement was prepared by Plaintiff and represented that Defendant had $365,500 in total assets, including $264,000 in "machinery and equipment" and $65,600 in "automobiles and

trucks," but did not list or further describe the assets. *Id.* It was identical to the financial statement that Ms. Tegan sent Defendant on January 7. *See* Ex. 100; Ex. 102 at 3. Testimony at trial, however, established that the equipment schedule listing Defendant's equipment and vehicles was not attached to the financial statement presented at closing. *See* Ex. 114 at 49.

Defendant became the owner of Magic Valley and began to operate the business, but it was unsuccessful. Magic Valley and Defendant subsequently defaulted on both loans. On January 22, 2020, Plaintiff initiated an action in state court to recover on the debt, and on March 2, 2020, Plaintiff obtained a judgment for $125,567. Ex. 105.

Defendant filed a chapter 7 bankruptcy petition on May 21, 2020. No. 20-40430-JMM, Dkt. No. 1. He listed the debt owed to Plaintiff as totaling $125,567.85, a sum that included $33,500 secured by collateral, and $92,067.84 unsecured. *Id.* at 20. At the 341 meeting of creditors, held on June 29, 2020, Defendant testified that he had never owned a JLG Man Lift, a John Deere 4640, or a Cincinnati Mill, and that those items belonged to his father. Ex.110 at 39–41. Additionally, the Defendant testified that he had sold any ownership interest he had in the Labond Lathe 8' Bed and the John Deere 310 C Backhoe before 2019. *Id.* All these items were listed on both the 2017 tax depreciation form and the equipment schedule. Exs. 101; 102.

On August 26, 2020, Plaintiff initiated this adversary proceeding against the Defendant, seeking to have the debt owed to it declared nondischargeable. Dkt. No. 1. Plaintiff contends that its claim is excepted from discharge under § 523(a)(2)(B) based on Defendant's representations both about his ownership of certain assets, as well as the

MEMORANDUM OF DECISION - 5

condition of the vehicles and equipment. *Id.* Plaintiff's claims are predicated upon three different written communications: (1) Defendant's 2017 tax depreciation form; (2) the financial statement; and (3) the text messages between Defendant and Mr. Corbridge. Dkt. No. 22 at 10–11.

## CONCLUSION OF LAW AND DISPOSITION

**A.   § 523(a)(2)(B)**

Plaintiff has asserted that $88,700 of its $127,773.88 claim is non-dischargeable under § 523(a)(2)(B).[2] Dkt. No. 1.  This statute provides that an individual debtor will not be discharged from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>> (B) use of a statement in writing—
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial condition;
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>> (iv) that the debtor caused to be made or published with intent to deceive.

§ 523(a)(2)(B). To assert a claim under § 523(a)(2)(B), Plaintiff must demonstrate by a preponderance of the evidence:

> (1) it provided debtor with money, property, services or credit based on a written representation of fact by the debtor as to the debtor's financial condition;
> (2) the representation was materially false;
> (3) the debtor knew the representation was false when made;
> (4) the debtor made the representation with the intention of deceiving the creditor;
> (5) the creditor relied on the representation;
> (6)  the creditor's reliance was reasonable; and

---

[2] Plaintiff is seeking to have only $88,700 of its $127,773.88 claim declared nondischargeable because that is the claimed value of the unowned collateral at issue in this case. Dkt. 36 at 17.

MEMORANDUM OF DECISION - 6

(7) damage proximately resulted from the representation.

*Maxwell v. Oregon (In re Maxwell)*, 600 B.R. 62, 69–70 (9th Cir. BAP 2019) (citing

*Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991));

*Spring Creek Cap., LLC v. Hawkes (In re Hawkes)*, 2020 WL 1170708, at *2 (Bankr. D.

Idaho March 10, 2020). The Court will consider the proof presented in support of each of

these elements.

## B. Written Representation

The first element under § 523(a)(2)(B) requires a showing that Plaintiff provided

Defendant with money, property, services, or credit based on a written representation of

fact by the Defendant as to the Defendant's financial condition. To be a "writing," it

must have been written by the debtor, signed by the debtor, or written by someone else

but adopted and used by the debtor. *Tallant v. Kauman (In re Tallant)*, 218 B.R. 58, 69

(9th Cir. BAP 1996). Additionally, that writing must concern the debtor's financial

condition. § 523(a)(2)(B). A statement concerns the debtor's financial condition if "it has

a direct relation to or impact on the debtor's overall financial status." *Lamar, Archer &

Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761, 201 L. Ed. 2d 102 (2018). "A single asset

has a direct relation to and impact on aggregate financial condition, so a statement about

a single asset bears on a debtor's overall financial condition and can help indicate

whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.*

Here, Plaintiff asserts that it extended the two loans to Magic Valley, with

Defendant acting as a guarantor, based upon three written representations concerning

Defendant's financial condition: (1) Defendant's 2017 tax depreciation form; (2) the

MEMORANDUM OF DECISION - 7

financial statement signed by Defendant; and (3) text messages between Defendant and

Mr. Brooks Corbridge.  The Court will consider each of these.

### 1. Tax Depreciation Form

The first written statement in issue is Defendant's tax depreciation form.  This

form was prepared as part of Defendant's 2017 tax return.  Defendant did not create this

document, but rather solicited the services of his family's accountant to prepare his taxes.

While Defendant did not create this particular document, he did adopt and use it by

providing it to Plaintiff as part of his loan application.  Because this document purports to

show Defendant's assets and their depreciated value, it does concern his overall financial

condition.  Thus, the tax depreciation form is a written representation made by Defendant

about his financial condition.

### 2. Financial Statement

Like the tax depreciation form, Defendant did not create the financial statement,

which was prepared by Ms. Tegan, an employee of Plaintiff's Burley branch.  However,

Defendant did sign the financial statement after having an opportunity to review it.

Additionally, the financial statement stated his total assets and liabilities, and thus

concerned his financial condition.

### 3. Text messages between Defendant and Bank Loan Officer

Plaintiff also alleges that a series of text messages from Defendant to Mr.

Corbridge constitutes a written representation concerning Defendant's financial

condition.  In these text messages, Mr. Corbridge solicits "a few pictures of the trucks."

Ex. 103 at 2. In response, Defendant sent pictures of a John Deere 4640 tractor, a 2001

International 930I, a 2008 35' C&B equipment trailer, a Kenworth W900, and a 1995 Dodge drag truck.  Additionally, Defendant sent the vehicle identifying numbers of several trucks and trailers, and pictures depicting the serial numbers of the Clark Hyster and JLG Man Lift.  Because the text messages describing the images and the identifying numbers were written by the Defendant, the messages constitute a written statement. These text messages purported to demonstrate Defendant's assets which could be used as collateral on the loans.[3]  Because these text messages concerned Defendant's assets, which relates to Defendant's ability to serve as guarantor on the loans, these messages were written statements concerning the Defendant's financial condition.

## C. Materially False Representations

The next issue concerns whether any of these three written representations were materially false.  A material representation is one that is "of the type which would generally affect a lender or guarantor's decision."  *Candland v. Insurance Co. of North America (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996).  The materially false representation can be based upon either "the inclusion of false information or upon the omission of information about a debtor's [or insider's] financial condition." *Tallant*, 218 B.R. at 71.

---

[3] The Court notes that the parties disagree as to the intended purpose of the text messages between Brooks Corbridge and Debtor. The Court will further address this issue when discussing the Debtor's knowledge and intent.

1. *Tax Depreciation Form*

The 2017 tax depreciation form contained materially false representations because it was the type of information that Plaintiff generally relied on in making a lending decision.  Ms. Tegan testified that Plaintiff uses tax depreciation forms in creating its cash flow analysis, developing the list of assets for the financial statement, and determining what can be used as collateral.  Additionally, the tax depreciation form contained false information by including multiple assets which Defendant did not own.

2. *Financial Statement*

Likewise, the financial statement signed by Defendant at closing was material. It listed Defendant's total assets as worth $365,500, a sum that included $264,000 in equipment and machinery. Ex. 100.  This calculation was a substantial overstatement of Defendant's worth, however, as it included $88,700 in unowned equipment and machinery.  Because a lender would generally rely upon representations concerning a borrower's net worth in deciding to extend a loan, the financial statement constituted a materially false representation.

3. *Text Messages*

Finally, the text messages between Defendant and Mr. Corbridge also contained materially false representations.  When asked by Mr. Corbridge to send pictures of the equipment and trucks, Defendant responded with multiple pictures, including depictions of a John Deere 4640 Tractor, Clark Hyster, and JLG Man Lift, all of which he did not own.  Additionally, Defendant sent a photo of a 1995 Dodge drag truck without disclosing that it did not have a functional motor at the time.  At the trial on this matter,

Mr. Corbridge testified that Plaintiff normally relies upon pictures of the collateral sent by clients, especially when dealing with smaller loans such as this one. Thus, because the text messages contained misleading information and Defendant failed to disclose that he did not own some of the items depicted, this was a materially false representation.

## D. Knowledge and Intent

The elements of knowledge and intent are closely intertwined and often analyzed together. *See, e.g.*, *Hirth v. Donovan (In re Hirth)*, 2014 WL 7048395, at *10 (9th Cir. BAP 2014); *Gertsch v. Johnson & Johnson (In re Gertsch)*, 237 B.R. 160, 167 (9th Cir. BAP 1999). Knowledge can be established through either actual knowledge of the representation's falsity, or by a reckless disregard for its truth. *Gertsch*, 237 B.R. at 167. However, inexcusable negligence alone is not sufficient to satisfy this element. *Advanta Nat'l Bank v. Kong (In re Kong)*, 239 B.R. 815, 826 (9th Cir. BAP 1999). To determine when "'misrepresentations cross the line from negligence to reckless disregard,'" the court will look to the totality of the circumstances. *In re Huskey v. Tollman (In re Tollman)*, 491 B.R. 138, 154 (Bankr. D. Idaho 2013) (quoting *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Colo. 2002)).

Closely related to the element of knowledge is intent. The plaintiff must demonstrate that the debtor acted with the "'intention and purpose of deceiving the creditor.'" *Gertsch*, 237 B.R. at 167 (quoting *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir.1978)). Like knowledge, intent may be "inferred from the totality of the circumstances, including reckless disregard for the truth." *Id.* (citing *Nat'l Union Fire Ins. Co., Pa. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 301 (2d Cir. 1996)).

MEMORANDUM OF DECISION - 11

Additionally, the court may consider the debtor's background and experience in making such a determination. *See Groth v. Masegian (In re Masegian)*, 134 B.R. 402, 404 (Bankr. E.D. Cal. 1991) (holding that failure to disclose pending lawsuit against debtor was reckless when considering debtor's background and experience as attorney and mortgage company president); *see also BBFM, Inc. v. Pizl (In re Pizl)*, 2008 WL 4853032, at *4 (Bankr. W.D. Wash. Nov. 7, 2008) (holding that debtor's misunderstanding of the term "net worth" was reckless when considering his background as a CPA and attorney).

 1. *Tax Depreciation Form and the Financial Statement*

The Court concludes Plaintiff has not established the elements of intent or knowledge as to either the representations contained in the 2017 tax depreciation form or the financial statement.  First, Defendant did not create the tax depreciation form—his accountant did as part of preparing Defendant's 2017 tax return.  While Defendant did provide them to Plaintiff as part of his loan application, Plaintiff has not presented sufficient evidence that Defendant was aware of this form's inclusion in his tax return or that his taxes may include false information.

Similarly, Defendant did not prepare the financial statement which he signed during the closing.  Rather, the financial statement was prepared by an employee of Plaintiff and presented for Defendant's signature during closing. The financial statement lists Defendant's total assets as $365,500—an overstatement of approximately $88,700. The financial statement itself, however, did not list which vehicles, trucks, equipment, or machinery were being used to calculate that number.  Further, it does not appear that the

MEMORANDUM OF DECISION - 12

equipment schedule, created by Plaintiff, was presented with or attached to the financial

statement at closing.  Plaintiff has presented evidence that Defendant received a secured

message from Ms. Tegan on January 7, 2019 with an attachment containing the financial

statement as well as the equipment schedule in an Excel spreadsheet.  Even if Defendant

opened the attachment, the equipment schedule was listed on a separate worksheet tab

than the financial statement, and there is no evidence Defendant viewed that document.

Additionally, the financial statement contained no reference to any attachments which

could have alerted Defendant to its existence.

As to both the tax depreciation form and the financial statement, the Court finds

that Plaintiff has not presented sufficient evidence of Defendant's knowledge or intent to

deceive.  In considering the totality of the circumstances, the Court notes Defendant's

education and experience.  He is not a sophisticated borrower. Defendant was in his

twenties and had never obtained commercial financing before his dealings with Plaintiff.

Unlike other cases, such as *Masegian* and *Pizl*, wherein the debtors had backgrounds in

finance and the law, Defendant here has not obtained any sort of business or financial

education and was not assisted by any professionals in obtaining these loans.  When

considering this lack of experience, Defendant's conduct may be considered inexcusably

negligent, but it does not rise to requisite level of reckless or intentional as required under

§ 523(a)(2)(B).

2. *Text Messages between Defendant and Mr. Corbridge*

The issue of knowledge and intent as to the text messages between Defendant and

Mr. Corbridge is a closer call.  In a text message sent on January 7, 2019, Mr. Corbridge

MEMORANDUM OF DECISION - 13

asked, "Are any of the trucks we were talking about taking as collateral ones that you were planning on selling?" After Defendant indicated no, Mr. Corbridge responded, "I think there might have been a misconception that you would be selling what were [sic] planning on taking as collateral. Would it be possible to get a few pictures of the trucks?" In response, Defendant sent Mr. Corbridge four pictures depicting certain trucks and equipment, including the John Deere 4640 Tractor that Defendant did not own, and a 1995 Dodge drag truck that was in poor condition. Additionally, in a series of text messages sent on and around January 15, 2019, upon request, Defendant sent Mr. Corbridge photos of the JLG Man Lift and the Clark Hyster, both which Defendant did not own.

At trial, Defendant testified that he believed Mr. Corbridge was asking for the pictures of the equipment and trucks as proof of secondary income. Conversely, Mr. Corbridge testified that he had asked for the pictures as proof of collateral, and Mr. Corbridge and Ms. Tegan both testified that Plaintiff would never ask for pictures of equipment or vehicles to establish a secondary income. While Plaintiff has produced credible testimony that Mr. Corbridge was seeking photos of the trucks and equipment as proof of collateral, not proof of secondary income, it is not Plaintiff's intent at issue, but Defendant's. As noted previously, at the time, Defendant was a 26-year-old man with limited business experience, had never sought commercial financing before, and had no financial or legal representation throughout this process. Though Mr. Corbridge referenced collateral in the same text message wherein he asked for pictures of the trucks, it is unclear whether Defendant understood the purpose of that request, and Mr.

MEMORANDUM OF DECISION - 14

Corbridge took no steps to specify or clarify.  The Court need not reach a conclusion as to Defendant's knowledge and intent as to the text messages, however, because the Court finds that Plaintiff has not established actual reliance.

### E. Reliance

Even if Defendant acted with the requisite intent and knowledge, Plaintiff has failed to prove by a preponderance of the evidence that it actually relied on Defendant's representations contained in the text messages. To establish the element of reliance, the creditor must show that it both actually relied upon the representation and that the reliance was reasonable. *Field v. Mans*, 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ("Section 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance in itself...."). Actual reliance occurs when, but for the representation, the creditor likely would not have entered into the transaction. *Heritage Pac. Fin. v. Montano (In re Montano)*, 501 B.R. 96, 117 (9th Cir. BAP 2013). However, the representation does not need to be the "sole or even the predominant or decisive factor in influencing [the creditor's conduct]. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision'" *Id.* (quoting *Engalla v. Permanente Med. Grp., Inc*., 938 P.2d 903, 919 (Cal. 1997)).

Actual reliance alone is not sufficient—that reliance must also be reasonable. When determining if reliance was reasonable, the Court will look to the totality of the circumstances, including whether the creditors acted in accordance with their normal business practices. *Maxwell*, 600 B.R. at 70 (citing *Candland*, 90 F.3d at 1471); *Gertsch*, 237 B.R. at 170.  A creditor does not have to perform extensive investigations into the

MEMORANDUM OF DECISION - 15

debtor's representations prior to extending a loan. *Gertsch*, 237 B.R. at 170 (quoting *In re Figge*, 94 B.R. 654, 665 (Bankr. S. D. Cal. 1988) ("[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.").  Despite the minimal investigation necessary, however, a creditor cannot ignore warnings which would have alerted a reasonably prudent person to the debtor's representations. *Heritage Pac. Fin. v. Machuca (In re Machuca)*, 483 B.R. 726, 736 (9th Cir. BAP 2012).

1. *Text Messages*

The issue of actual reliance proves dispositive as to the text messages between Mr. Corbridge and Defendant.  First, neither the Clark Hyster nor the JLG Man Lift was listed in the loan documents or used in Plaintiff's calculation of the collateral's value.  Plaintiff has not provided any other testimony or evidence demonstrating that it used Defendant's representations concerning either piece of equipment in its decision to extend the loans.  Thus, Plaintiff has not established actual reliance on the text messages concerning the Clark Hyster or JLG Man Lift.

Plaintiff has presented some evidence as to its reliance on the representations concerning the John Deere 4640 Tractor.  At trial, Ms. Tegan testified that she would not have extended the loan but for the John Deere 4640 Tractor and John Deere 310 C Backhoe acting as collateral.[4]  Further, Plaintiff's loan memorandum lists the tractor in its

---

[4] The Court will not address the issue of reliance as to the John Deere 310 C Backhoe, as the text messages between Debtor and Mr. Corbridge contained no mention of it. Any other representations concerning the backhoe contained in the tax depreciation form or equipment schedule are not relevant for this discussion, as the Court has already found that the Debtor lacked intent as to those communications.

MEMORANDUM OF DECISION - 16

collateral description and used its value to calculate the total collateral and loan-to-value

("LTV") ratio.  Including the John Deere 4640 Tractor, the LTV ratio is calculated at

39.3%. Ex. 104 at 3. Mr. Corbridge testified that for this sort of loan, Plaintiff generally

considers an LTV ratio below 60% as good. 16:07. However, even when eliminating all

unowned property, totaling $88,700, from Plaintiff's calculation, the LTV ratio is still at

54%, within the threshold that Plaintiff considers "good."[5] *Id.* This calculation calls into

question whether Plaintiff would have denied the loan but for the Defendant's

representations that he owned the John Deere tractor.

    Plaintiff also contends that Defendant misrepresented the value of the 1995 Dodge

truck by sending a picture of it and failing to disclose that the truck did not have a

functional motor.  However, Plaintiff has not provided any evidence that it relied on that

representation when forming its valuation of the collateral.  When determining the value

of the collateral, Plaintiff did not rely on any of Defendant's representations but rather

looked up the values on an independent website. *See* Ex. 104 at 3.  According to the 2017

tax depreciation form and equipment schedule, the Dodge truck was worth $12,500.

However, the loan application summary only lists the Dodge truck in question as being

worth $3,475. Ex. 207.  Considering this discrepancy, it does not appear that Plaintiff

relied on Defendant's representations when determining the value of the collateral.

---

[5] Mr. Corbridge testified at trial as to the LTV calculation, which involves dividing the total loan balance by the total fair market value. As originally calculated by Plaintiff, Defendant's fair market value was $321,535. When subtracting $88,700—the value of the unowned collateral—from that figure, Defendant's fair market value is $232,825. The total loan balance ($126,208) divided by the reduced fair market value ($232,825) comes out to .542, or 54%.

MEMORANDUM OF DECISION - 17

Additionally, the Defendant has presented some evidence that Plaintiff was more concerned with keeping the Lakes—an important client—happy than with Defendant's financial state.  First, Defendant was originally denied financing from Plaintiff's Blue Lakes branch, even when the purchase price was reduced to $200,000.  However, after the Lakes got involved and directed Defendant to their banker at the Burley branch, Defendant was able to obtain financing.  Furthermore, in an internal Bank email between Mr. Corbridge, Ms. Tegan, and Kevin Smith sent on June 12, 2020, Mr. Corbridge noted that "there was enough signs that we never should have done this loan.  With Rod and Braden [the Lakes] involved we tried to accommodate more than we should have." Ex. 209 at 4.  While Plaintiff need not show that Defendant's misrepresentations were its sole consideration in extending a loan, it must demonstrate that it was a substantial factor.

On balance, after considering the Defendant's LTV ratio calculated without the unowned property, Plaintiff's use of independent sources to look up the value of the collateral, and Plaintiff's prioritization of its relationship with the Lakes, the Court finds that Plaintiff has not proven by a preponderance of the evidence that it actually relied upon the Defendant's representations concerning his ownership or the condition of the collateral via text message.

 Accordingly, the Court finds that Plaintiff has not established the elements of § 523(a)(2)(B).  Because Plaintiff has not met its burden as to proving intent or actual reliance, the Court does not need to reach the issues of reasonable reliance or proximate cause.

MEMORANDUM OF DECISION - 18

## CONCLUSION

Plaintiff has not proven by a preponderance of the evidence each of the requisite elements of § 523(a)(2)(B), and thus it will not prevail in this adversary proceeding to have its claim declared nondischargeable. Judgment will therefore be entered for the Defendant.

DATED:  September 2, 2021



_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 19